**CONFIDENTIAL**

REPORT OF INQUIRY

RE:

**Concern for Personal Safety in the Workplace
Expressed by
Marilyn Tolbert-Smith**

For
Office of Legacy Management
U.S. Department of Energy
Washington, DC

Investigator:

Raj K. Gupta, Esq., for
Susan Grimes Associates, Inc.
2900 M Street, N.W.
Washington, DC 20007-3735

September 2006

# REPORT

## Introduction

In late August 2006, Marilyn Tolbert-Smith (hereinafter Complainant), a GS-14 Program Analyst in the Office of Business Operations in the Office of Legacy Management, Department of Energy ("the agency") complained to the Director of the Office of Legacy Management, Mr. Mike Owen, that she felt personally threatened by her immediate supervisor, Mr. Terry Brennan. Complainant's office is in the L'Enfant Plaza Building in Washington, DC; Mr. Brennan's office is in Pittsburgh, Pennsylvania. Complainant's second line supervisor, Ms. Celinda Crawford, is stationed in the Morgantown, West Virginia, office and Mr. Owen, her fourth line supervisor, is in Washington, D.C.

Complainant has filed several EEO complaints and a civil suit in the federal district court pertaining to her varied allegations involving, *inter alia*, discrimination on the basis of a disability and hostile work environment. Therefore, the agency decided to retain the services of an outside firm, Susan Grimes Associates, Inc., to conduct an inquiry into Complainant's most recent allegation concerning her fear for her personal safety.

A Letter of Authority, dated September 6, 2006, to conduct the inquiry was issued to Raj K. Gupta, Esq., an investigator with Susan Grimes Associates, Inc. (**Attachment 1**). Each witness to this inquiry was provided a copy of this letter prior to the taking of testimony by Mr. Gupta. Mr. Gupta's bio is at **Attachment 4**.

This management inquiry was limited to investigating the concern for Complainant's personal safety expressed by Complainant to Mr. Owen and not the merits of her other claims pending in her previously filed EEO actions. The investigation began with an interview in person with Complainant on Wednesday, September 6, 2006, at the agency's Forrestal Office Building at 1000 Independence Avenue, SW, Washington, D.C. Mr. Brennan was interviewed by the investigator over the telephone on Tuesday, September 12, 2006. Other witnesses were interviewed by telephone.

## Marilyn Tolbert-Smith's testimony

Complainant stated she has been employed by the agency since 1991, and has been in her current position in the Office of Legacy Management since 2003. She stated that her first line supervisor, Mr. Brennan, joined the agency about 2-1/2 years ago, and she has been under his direct supervision since. Complainant stated she and Mr. Brennan have had a strained relationship for over two years, and she asked Mr. Brennan to reassign her sometime around July 2004. She stated she did not receive any response to her request for reassignment until about December 2005, when her second-line supervisor, Ms. Celinda Crawford, gave a negative response to her request.

Complainant stated she suffers from depression. She asserted Mr. Bennnan's mother had suffered from depression and his sister is manic-depressive and their conditions may have in some way negatively influenced Mr. Brennan's relationship with her.

1

Complainant stated she needed to provide the investigator a brief background of her work relationship with Mr. Brennan to be able to put in context her fear of him. Complainant stated she has several EEO disputes and a lawsuit pending against the agency in which Mr. Brennan is named as a management official discriminating against her. Complainant described to the investigator, at some length, the history of various hospitalizations during the last two years; a workplace injury she suffered during an office move in May 2006; and the manner Mr. Brennan and Ms. Crawford handled those situations. She also described the manner in which Mr. Brennan handled her mid-term performance review in June 2006. However, this background information did not provide any evidence that Mr. Brennan had acted toward Complainant in any threatening manner, such as making verbal threats or making physical gestures which could be described as physically threatening toward a person. Therefore, this report does not include a narrative summarizing that information although documentation provided by the Complainant is attached.

Complainant stated she lives in Hagerstown, Maryland, and was assigned to work in the Germantown, Maryland office until her relocation to the Washington D.C. office in May 2006.

Complainant had her performance review with Mr. Brennan on June 7, 2006. Complainant was accompanied to the performance review meeting by Theresa Summers, a Labor Relations Specialist in the HR office. Complainant testified Mr. Brennan told her during the meeting that he knew she had filed an EEO complaint, and that she and her lawyer were not being truthful when she stated he told her attendance at the office retreat in May 2006 was mandatory. She testified that Mr. Brennan said she should follow the chain of command because her lawyer had apparently carbon copied some of the communications (maybe her EEO complaint) to Mr. Owen. She testified that after the performance review meeting, she found the e-mail in which Mr. Brennan said the retreat was mandatory, and she forwarded the e-mail to Mr. Brennan and Ms. Summers. Complainant testified she found it disturbing that Mr. Brennan was bringing up her EEO complaint during the course of a performance review.

Complainant testified that Mr. Brennan sent her a letter after the June 7, 2006 performance review meeting in which he told her she would be subject to adverse action if she did not follow the proper chain of command in the office. She stated the letter made her feel as if she could not go to anyone other than Mr. Brennan with her problems.

Complainant stated she drafted a statement about what had happened during the June 7, 2006 performance review and sent it to her own attorney but not to Mr. Brennan because she was afraid her May 2006 doctor's request for her reassignment would be adversely affected if she sent the statement to Mr. Brennan. She stated she had previously sent her doctor's request for her reassignment by fax to Suzanne Piper in HR, and Ms. Piper had given it to Mr. Brennan. Complainant testified Ms. Piper's action made her feel helpless because no matter what she did, she could not get past Mr. Brennan.

2

Complainant testified she hurt her neck on the job during the May 2006 move from Germantown to Washington, D.C. Complainant stated Mr. Brennan inappropriately handled her workers' compensation claim; denied some of her requests for time off in connection with her injury; inappropriately demanded medical documentation; and demanded that she account for leave usage during the time she was on continuation-of-pay leave. She stated she felt harassed by Mr. Brennan's demands and could not adequately deal with her neck pain. She felt she could not appeal to anyone above Mr. Brennan because of his restriction that she must follow the chain of command.

Complainant stated there was confusion about her leave usage between May and August 2006 concerning the amount of leave she was allowed to take under a 45-day continuation-of-pay leave award from the Department of Labor. She said it was her understanding that the agency's OWCP staff would work with her timekeeper to figure out the continuation-of-pay leave. She got an e-mail from Mr. Brennan, around August 21, 2006, saying she had until noon the following day to get her leave situation resolved. She testified she was stunned because she did not know how to resolve the issue because she was not a leave specialist. She said she told Mr. Brennan that it would have to be worked out between Ms. Adams in OWCP and the timekeeper, to which he responded she should be responsible for her own leave. She testified she felt "freaked out." She testified that by this time she had involved everyone - HR, DOL, EEO, OWCP - because Mr. Brennan was on her case, and she could not go to Mr. Owen or anyone else in the chain of command, and no one else could stop Mr. Brennan. Complainant stated Mr. Brennan ultimately gave up on the leave issue, but then came back at her on an assignment he had given her.

Complainant stated following this incident, she found on the internet the letter from Secretary Bodman about the agency's anti-harassment policy which stated that if she felt harassed she could go to any manager in the agency. She stated this is when she felt free to go to Mr. Owen and no longer constrained by Mr. Brennan's chain-of-command restriction.

Complainant stated she went to see Mr. Owen toward the end of August 2006 and told him that she felt threatened by Mr. Brennan. She said that Mr. Owen said he did not understand why she would be so afraid of Mr. Brennan who is stationed 300 miles away. She said Mr. Brennan comes to Washington D.C. for meetings and she had no idea when he or Ms. Crawford would approach her. She said she told Mr. Owen that all she ever asked for was a reassignment over two years ago. She said Mr. Owen acknowledged she had filed an EEO complaint about the reassignment. She stated Mr. Owen said no one should be afraid for her own safety. She said she did not know who to go to, so she decided to come to see him.

Upon being asked by the investigator to describe what made her feel threatened for her personal safety, other than the information she provided describing how she felt harassed by Mr. Brennan and other differences between them regarding her performance, Complainant stated she could tell from the tone of Mr. Brennan's voice in conversations with her, as well as from his e-mails to her, that he was very spiteful, angry and irrational.

3

She testified: "when somebody is that angry with you, they can do anything." Complainant stated that even though Mr. Brennan is located in the Pittsburgh office, he could show up in Washington anytime, and she was terrified of him because of all that had been going on.

Complainant also stated that Mr. Brennan knows where she lives because he had driven her home once when she was visiting him at work in Pittsburgh and she was viewed as not being well. She testified Mr. Brennan had gotten more and more outraged at her over the two-year period; he looked annoyed when talking to her and his tone of voice on the telephone was angry. She stated, however, she was not in that many face to face meetings with him.

Complainant stated that Ms. Summers, who was at the performance review meeting in June 2006, stated she was surprised at what happened during the meeting and by the dichotomy between Mr. Brennan's behavior at the meeting and the tone of written communications from him to her. Complainant testified that Mr. Brennan is very careful in how he conducts himself in the presence of other people and sounds very concerned about people.

Upon being asked by the investigator if Mr. Brennan had ever acted in a physical manner which would be considered threatening toward her or anyone else, Complainant testified she had seen Mr. Brennan get frustrated at meetings and Complainant pounded her fist on the desk to demonstrate Mr. Brennan's behavior. However, she stated she had never seen Mr. Brennan behave in a physically violent or threatening manner toward anyone.

Complainant concluded the interview with repeated statements that she was very apprehensive for her personal safety at the hands of Mr. Brennan and she did not know how to protect herself against that danger. Complainant frequently wept during the three and one half hour interview.

**Terry Brennan's testimony**

Terry Brennan, Complainant's first line supervisor, has been employed with the Department of Energy since 1995. He has been in his current position as a GS-15 Team Leader, Archives and Information Management Team, in the Pittsburgh, Pennsylvania, office since April 2004. He currently supervises a team of nine employees, including Complainant, spread over a five state area. He has been Complainant's immediate supervisor since April 2004.

Mr. Brennan said his working relationship with Complainant has been challenging. He stated she is an independent person who does not work very well in self-directed teams.

Mr. Brennan acknowledged driving Complainant home on one occasion. Mr. Brennan stated that in the fall of 2004, he was in Morgantown, WV, with his first line supervisor Ms. Crawford, and was surprised to learn that Complainant was also there. He stated the evening before Complainant had called him stating she was reporting to a doctor's office

4

at 8 a.m. the following morning for possible hospitalization. Instead, he said, she came to the Morgantown office with her bags and suitcases. He stated that Complainant's appearance indicated she had not eaten or slept for days. Mr. Brennan said he and Ms. Crawford met with Complainant in a private office and during that meeting, she told them she had contemplated committing suicide. He said they then asked her if it would be okay for them to call her physician. He stated Complainant called her physician, Dr. Prescott in Hagerstown, and he, Complainant and Ms. Crawford were all on the line with Dr. Prescott. He said they told Dr. Prescott about Complainant's suicidal thoughts and Dr. Prescott expressed concern that Complainant was supposed to see him that morning but was instead in Morgantown. Mr. Brennan stated Complainant was in no condition to drive, therefore, he and Ms. Crawford volunteered to drive Complainant home to Hagerstown, a distance of four hours. He stated this is the only time he has been to Complainant's house.

Mr. Brennan said that after the above incident, Complainant did not return to work until May 2005. He stated that while she was hospitalized, she was a very resourceful person, managed to have access to a computer, and called almost every other week to complain about the doctors and what was going on, etc.

Mr. Brennan said he thought he had a good working relationship with Complainant until she returned to work in May 2005. He felt she somehow thought he was responsible for her six months absence from work. Mr. Brennan stated that during those six months, she sent e-mails concerning him to Ms. Crawford and Mr. Owen saying things which were not true.

Mr. Brennan said that sometime in early July 2005, he denied Complainant permission to travel to the Pittsburgh office, but she went anyway. He stated that during her road trip to Pittsburgh, Complainant had telephone conversations with Sharon Rudy, a former co-worker who was in HR at this time, which gave Ms. Rudy the impression that Complainant was in no condition to drive. He said Ms. Rudy told him Complainant was screaming on the telephone. Mr. Brennan said Ms. Rudy called him after her conversation with Complainant and they decided Complainant should be asked to stay at a hotel overnight in Pittsburgh and then return home the following day. After that incident, he said, the Complainant was again away from work until March 28, 2006.

Mr. Brennan stated that during Complainant's extended absence, Complainant filed two EEO complaints against him, and subsequently a civil action. He stated that since March 2006, every meeting he has had with Complainant has been witnessed by either Sharon Rudy or other team members. He stated a series of meetings on June 7, 2006 with Complainant regarding her mid-term performance review were witnessed by Theresa Summers. He stated this was his last in-person meeting with Complainant. He stated he has been "walking on egg shells" communicating with Complainant, and virtually all of his communications with her have been based on prior advice and counsel from various persons in the agency's General Counsel's office or HR.

5

Mr. Brennan stated he sometimes gets frustrated but not angry. He said he has never been in a fight in his life, and has never yelled at anyone. He stated if he gets angry, he tries to diffuse the situation. He said that he has very minimal voice communications with Complainant; she prefers to communicate with him by e-mails and sometimes sends a series of e-mails in quick succession to which he sometimes replies - it's enough and stop. He said he is not a physical person, is not loud and does not scream, but may waive his hands while he speaks. He said he does not pound fists at meetings.

Mr. Brennan said he made no reference to Complainant's EEO complaints during the June 7, 2006 meetings with Complainant but he did make a reference to her lawyer pertaining to something unrelated to her EEO complaints. Mr. Brennan said this related to an incident on March 28, 2006, when Complainant returned from her extended absence, and he assigned her to work on the Records Management Team. He said she was very agitated about the assignment. He stated that on March 29th he received a call from Katie Strangis, an agency attorney, saying she had received an e-mail or something from Complainant's attorney attributing a comment to him made to Complainant. Mr. Brennan stated he denied the attribution and talked to Sharon Rudy, who was the HR team leader, and Ms. Rudy talked with Complainant. Mr. Brennan said afterwards he was afraid he could not say anything to Complainant without having his words twisted by her. He said that between March 29 and June 7, 2006, there had been a pattern of communications in which Complainant twisted the things he said and reported them to his supervisor, Ms. Crawford, as well as directly to Mr. Owen. He said he was referring to this behavior on June 7th when he said to Complainant that she and her lawyer should be truthful about what they say about him.

Mr. Brennan said Complainant had a tendency to jump directly to the top level in the organization, to Mr. Owen. Mr. Brennan said he told Complainant on March 28, 2006, that she should respect the chain of command, and he repeated this to her on June 7, 2006 and told her she would be receiving a counseling memorandum to that effect. In the memorandum, he said he told her if she did not follow the chain of command, there might be adverse consequences, but he also told her the memorandum would not be a part of her official personnel file unless she violated the instructions.

Mr. Brennan said there was confusion about Complainant's use of leave and use of continuation-of-pay leave, as approved by the workers' compensation program, because she had not provided any supporting medical documentation or submitted leave slips designating the nature of leave she had been taking. Mr. Brennan acknowledged asking Complainant on August 21, 2006, to straighten out her leave situation for the period covering May through August by the following day at noon, because, he said, she had taken a great deal of leave during that period without either submitting leave slips specifying the type of leave or providing any medical documentation. He said he sent her a long e-mail explaining she had to submit four leave slips specifying the type of leave she was on during that time.

At the close of the interview, the investigator asked Mr. Brennan if there was anything else he could think of that he might have done which could possibly make Complainant

6

fear for her personal safety. Mr. Brennan said he wished all his other staff could be asked to testify because he is just not the kind of a person who would do anything to create that feeling. He said he has been in Federal service for 30 years, and had also served four years in the military. He said he might have gotten frustrated at times in dealing with Complainant, but he is not the kind of person who slams doors or pounds tables or engages in any such physical type of behavior. He said it really upset him when he first heard that Complainant had alleged her concern for her personal safety to Mr. Owen. Mr. Brennan said he was also very confused by this concern of Complainant's because only about a week after she expressed this concern to Mr. Owen she told Mr. Brennan she was excited about the possibility of working on a paper with him on waste management. Mr. Brennan said Complainant was working on a taxonomy project and had run into someone from the Argon National Lab. In talking to this person, Complainant came up with the idea that it would be a win-win situation for everyone if the two of them, Complainant and Mr. Brennan, could co-author a paper and present it at the waste management conference. He said he was very confused by the conflicting behavior.

**Witnesses**

The investigator randomly selected two of Complainant's coworkers to interview:

**Jeanie Gueretta's testimony**

Jeanie Gueretta, GS-13 Program Analyst, has been employed with the agency since 1985, and has worked under Mr. Brennan's direct supervision since 2004. She has been located in the agency's Grand Junction, Colorado office since 1995. Ms. Gueretta stated she and Complainant have been co-workers since before the time Mr. Brennan began to supervise them.

Ms. Gueretta stated that her work relationship with her coworkers is cordial, pleasant and business like. She stated she has never experienced any conduct, physical or verbal, from any coworker or supervisor which she would consider intimidating or threatening to her own personal safety.

When asked to describe the nature of her interactions with Complainant, Ms. Gueretta stated she has not had much interaction with Complainant during the last eight months because Complainant has been gone much of the time. Ms. Gueretta stated that prior to the recent eight month period, she had probably weekly interactions via conference calls, video and telephonic, with Complainant, and she occasionally had some interactions in person with Complainant at meetings or work-related travel.

Ms. Gueretta stated she has found Complainant to be very credible in their work relationship. Ms. Gueretta stated Complainant is very intelligent and knowledgeable. Ms. Gueretta stated Complainant can be very involved with her work and be somewhat compulsive, often working on her own time.

7

Ms. Gueretta stated that Complainant seems to believe her own description of events, but in Ms. Gueretta's opinion, Complainant's descriptions were exaggerations or the result of Complainant reading too much into what had really happened. Ms. Gueretta stated Complainant seemed to have a tendency to see things differently than others did. For instance, Ms. Gueretta stated she would tell Complainant something and then find that Complainant had misinterpreted what she meant to say.

Ms. Gueretta stated, for example, that even before Mr. Brennan became their supervisor, Ms. Gueretta had told Complainant about a disagreement on a project with their then acting supervisor. Ms. Gueretta stated that later Complainant had interpreted her comments to mean how difficult it was to work with the acting supervisor. Ms. Gueretta said she told Complainant that is not what she had actually said or meant, she simply did not agree with the acting supervisor's comments on a particular project, just as anyone might have legitimate differences of opinion on a project with one's supervisor.

Ms. Gueretta stated Complainant exhibited the same tendency to read too much into the actions of another coworker and Complainant's actions became very uncomfortable and almost embarrassing. Ms. Gueretta said Complainant would at times snap at the coworker no matter what the coworker said; Complainant would always disagree and get into a debate with the coworker, in almost an automatic reaction on the part of Complainant.

Ms. Gueretta stated she has had occasion to observe in-person interactions between Complainant and Mr. Brennan and in her opinion those interactions have been very professional and Mr. Brennan has never treated Complainant differently. She added Mr. Brennan seems to go an extra step in an attempt to try to include Complainant, for instance when Complainant returned to work after long periods of absences, Mr. Brennan made an extra effort to help her catch up.

Ms. Gueretta stated she has never seen Mr. Brennan pound his fist on a desk, or observed Mr. Brennan act toward Complainant, or anyone, physically or verbally that could be perceived as threatening.

Ms. Gueretta stated she would not find it credible to believe Mr. Brennan might harm Complainant physically, as alleged by Complainant. Ms. Gueretta stated, based on her experience with Complainant, Complainant allows thing to escalate in her own mind.

Ms. Gueretta concluded the interview by repeating that in her own experience with Complainant, she has found Complainant to be a very driven person, however, Complainant tends to read more into things than what is really there.

**Deborah Haddix testimony**

Deborah Haddix, GS-11 Program Analyst, has been employed with the agency for about three and a half years. She was under Mr. Brennan's direct supervision for about two and a half years until about May 2006. Her current first line supervisor is Ms. Crawford. Ms.

8

Haddix has worked in the agency's office in Morgantown, West Virginia since she joined the agency.

Ms. Haddix stated her relationships with her coworkers have been business like and professional. Ms. Haddix stated she has never experienced any conduct, physical or verbal, from any coworker or supervisor, that she would consider intimidating or threatening. She stated that on one occasion, soon after she started working at the agency, Complainant, upon meeting her for the first time, grabbed her by the neck and asked her why she did not tell Complainant that Mr. Owen was not coming to a meeting. Ms. Haddix said she was taken by surprise when this happened, especially because this was the first time the two of them had met and she could not tell if Complainant was just kidding. Ms. Haddix said she did not feel threatened by this action because Complainant is physically small.

Ms. Haddix said that most of her interactions with Complainant have been via telephone calls or participation in bi-weekly team meetings via video or telephonic conference calls. Ms. Haddix stated she also receives some comments on work from Complainant via e-mail. Ms. Haddix added that Complainant sometimes tends to be argumentative at meetings and tells people how to do things, etc.

Ms. Haddix stated that Mr. Brennan is very professional in team meetings with everyone, and occasionally Mr. Brennan tries to calm down Complainant when, for example, she gets argumentative. Ms. Haddix stated she had never seen any other type of confrontation between Mr. Brennan and Complainant.

Ms. Haddix stated she has never observed Mr. Brennan act in a manner, physically or verbally, which could be perceived as threatening toward anyone, nor has she observed Mr. Brennan pound his fist on a table.

Ms. Haddix stated she did not think Mr. Brennan would ever hurt anybody. Ms. Haddix concluded the interview with the observation that, in her view, Mr. Brennan is always professional.

**Documentation provided by the parties**

During the course of this investigation, the parties provided documentation to the investigator. Complainant's counsel submitted extensive documentation dealing with Complainant's prior EEO complaints and the pending civil action. These documents do not have a direct bearing on Complainant's recent expression of concern for her personal safety, but they contain a more detailed account of the background information provided by Complainant to the investigator during the interview, which has been summarized hereinabove. These documents appear as **Attachment 3**.

The agency provided the investigator a copy of a memorandum prepared by Mr. Owen, the Office Director, on August 24, 2006, to document Complainant's meeting with him on August 23rd at which she expressed her concern for her personal safety to him. See

9

**Attachment 2**.  Mr. Owen's own contemporaneous account of Complainant's conversation with him regarding her fear for her personal safety is consistent with the testimony provided by Complainant on the issue.

## Analysis

Complainant provided extensive background information covering her work relationship with her immediate supervisor in support of her contention that her fears are based on the tension between her and Mr. Brennan. She perceives Mr. Brennan's communications, oral and written, as increasingly hostile and suggestive of anger toward her. However, she acknowledged Mr. Brennan has never acted in a physically violent manner toward her or any one else, to her knowledge, or made any remarks threatening such behavior.

Although Complainant's workstation is located several hundred miles away from Mr. Brennan, Complainant stated she remains apprehensive because he often comes to her office location; she is afraid she might run into him; and she is concerned that because he knows where she lives he might visit her there. Mr. Brennan has been to her home only once, about two years ago, when he and his own immediate supervisor, Ms. Crawford, volunteered to drive Complainant home from Morgantown, WV, to Hagerstown, MD, because of a concern for Complainant's physical well-being. There is no evidence to suggest that Mr. Brennan has tried to visit with the Complainant outside of her work environs for any other reason or any other time.

Complainant also acknowledged to the investigator that Mr. Brennan has never acted in a threatening manner in any of her meetings with him. However, she maintains that the tone of voice he uses with her during telephone conversations, not witnessed by others, as well as in his written communications to her, makes her very apprehensive of him.

Coworkers testified they saw no evidence of Mr. Brennan ever exhibiting any threatening behavior and described him as always professional. Both witnesses saw Mr. Brennan as making an extra effort on behalf of the Complainant and viewed Complainant, not Mr. Brennan, as argumentative.

Mr. Brennan maintained he never uses any physical gestures that could be perceived as threatening and has never engaged in any violent physical behavior. He acknowledged he might at times get frustrated in dealing with Complainant but has never pounded his fist to express that frustration. He also said that all meetings with Complainant, in-person or video conference, since March 2006, have been attended by at least one other agency employee.

As a basis of her fear for personal safety, Complainant seems to attach much significance to the fact that Mr. Brennan had constrained her from going to anyone outside the chain of command. Even though Mr. Brennan did in fact instruct her to follow the chain of command, there is no suggestion that he told her she could not go above him to complain about anything concerning him, just that she had to do it in an orderly fashion by going to each successively higher level when dissatisfied.

The apparently precipitating event for Complainant making the instant allegation was Mr. Brennan's instruction that she must sort out her use of leave within a day. Complainant described how she felt helpless that she had worked with so many different people in the agency as well as with the Department of Labor on this leave issue and that Mr. Brennan was unreasonably pushing her to do something she could not do. Even assuming she had a legitimate concern that she might face adverse consequences if she did not satisfy this allegedly unreasonable demand from Mr. Brennan, and felt helpless she could not go to anyone higher up to get her issues addressed, there is no evidence to support her allegation that Mr. Brennan's behavior posed a danger to her personal safety.

One coworker, who provided several examples of Complainant's behavior, opined that Complainant has a tendency to read too much into a situation, exaggerate or misconstrue the actions of others.

## Conclusion

The only evidence Complainant put forth to support her contention that she is in physical danger from Mr. Brennan is:
1. The fact that he knows where she lives and works; and
2. His tone in both written and oral communications makes her apprehensive.

It appears Complainant's concern for her own safety is based on her own belief that a person who is upset or angry is capable of engaging in violence. The investigator found no indirect or direct evidence to support this conclusion. There is no evidence that Mr. Brennan engaged in any extreme, severe or threatening conduct. The evidence put forth by Complainant does not rise to a level that would persuade a reasonable person to conclude that Mr. Brennan is a safety concern.

*Roji Gupta by SG*
*10/2/06*

TABLE OF CONTENTS

Attachments:

1. Letter of Authority, dated September 6, 2006, issued by Katie Strangis.
2. Memorandum for the record, dated August 24, 2006, by Michael W. Owen.
3. Letter the Law Firm of John Berry, PLLC, to Raj Gupta, dated September 9, 2006, along with the following enclosures:
   a. Designation of representative
   b. Civil action complaint in Marilyn Tolbert-Smith v. Samuel Bodman
   c. Letter from Gerald P. Tognetti to Marilyn Tolbert-Smith, dated January 11, 2006
   d. Formal complaint of discrimination, filed 2/9/06
   e. Pre-complaint counseling/intake for Marilyn Tolbert-Smith
   f. Formal complaint of discrimination, dated July 7, 2006
   g. Formal complaint of discrimination, dated July 18, 2006
   h. Memorandum from Celinda Crawford to Marilyn Tolbert-Smith, dated December 22, 2005
   i. Letter from Cheryl Polydor to Celinda Crawford, dated December 30, 2005
   j. Letter from Cheryl Polydor to Katie Strangis, dated March 22, 2006
   k. Letter from Cheryl Polydor to Katie Strangis, dated March 27, 2006
   l. Letter from Cheryl Polydor to Mike Owen, dated May 19, 2006
   m. Memo to the record for June 7, 2006 Marilyn Tolbert-Smith Performance Review
   n. Letter from William G. Prescott, dated June 23, 2006
   o. Letter from Celinda H. Crawford to Cheryl Polydor, dated July 7, 2006
4. Investigator Raj K. Gupta's resume for qualifications to conduct a management inquiry in employee allegations concerning the workplace environment.